**Alec N. Ohanian**
**California State Bar Number: 334015**
**679 Robin Glen Drive**
**Glendale, CA 91202**
alecnohanian@gmail.com

***Counsel for Plaintiffs***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Alec Ohanian, an individual, and Artin Ohanian, an individual.**<br><br>*Plaintiffs* | **Case No.:** 2:23-cv-01245 |
| **vs.**<br><br>**Stablegains, Inc., a Delaware Corporation, And DOES 1-100, inclusive.**<br><br>*Defendant(s)* | **Plaintiff's Complaint** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................2

INTRODUCTION ..........................................................................................................3

PARTIES.........................................................................................................................4

JURISDICTION AND VENUE ......................................................................................5

FACTUAL ALLEGATIONS...........................................................................................9

I. BACKGROUND ON CRYPTO-ASSETS, CRYPTO-ASSET EXCHANGES AND

STABLEGAINS, INC.........................………………………………………........9

A. The Blockchain and Crypto-Assets Generally ........................................................9

B. Stablecoins...............................................................................................................10

C. Algorithmic Stablecoins..........................................................................................12

II. THE TERRA (LUNA / UST) ECOSYSTEM........................................................12

A. The Creation of The Terra Ecosystem....................................................................12

B. The Interrelationship Of UST/LUNA As Part of An Economic Scheme...............14

C. The Anchor Protocol Created by TFL Formed an Essential Part of the UST/LUNA

Economic Scheme .......................................................................................................17

D. Despite Claiming That the Algorithm Underlying UST Was Sound, TFL Establishes

Non-Luna Reserves to Protect the UST Peg................................................................18

E. UST Collapses, Wiping Out Billions of Dollars in Investments………................19

III. THE SEC HAS REPEATEDLY INSTRUCTED THAT CRYPTO-ASSETS LIKE UST

AND LUNA ARE SECURITIES ................................................................................21

IV. UST IS AN UNREGISTERED SECURITY.........................................................23

A. UST Is an Investment Contract ...............................................................................23

1. UST Purchasers Made an Investment of Money....................................................................23

2. UST Purchasers Invested in A Common Enterprise ............................................................24

3. UST Purchasers Had a Reasonable Expectation of Profits ..................................................25

4. UST Purchasers Expected Profits in Reliance on The Efforts of Others .............................26

B. UST Is Also an Unregistered Security Because It Is a Derivative Of LUNA, Another
Unregistered Security ...............................................................................................................30

1. LUNA Purchasers Made an Investment of Money ..............................................................31

2. LUNA Purchasers Invested in A Common Enterprise.........................................................31

3. LUNA Purchasers Had a Reasonable Expectation of Profits...............................................32

4. LUNA Purchasers Expected Profits in Reliance on The Efforts of Others...........................34

**V. STABLEGAINS, INC. ILLEGALLY LISTED AND SOLD UST EVEN THOUGH IT IS
NOT REGISTERED, IN VIOLATION OF THE SECURITIES LAWS ..............................35**

**VI. STABLEGAINS, INC. PURCHASED THE UST SECURITY USING DEPOSITOR
FUNDS EVEN THOUGH IT IS NOT REGISTERED AS A BROKER-DEALER, IN
VIOLATION OF THE SECURITIES LAWS.......................................................................36**

**VII. STABLEGAINS, INC. LISTED AND SOLD THE UST SECURITY EVEN THOUGH
IT IS NOT REGISTERED AS A BROKER-DEALER IN VIOLATION OF THE
SECURITIES LAWS............................................................................................................37**

**VIII. STABLEGAINS INC.'S WITHDRAWAL RELEASE SCHEME IS PUNITIVELY
DESIGNED TO DISCOURAGE RETAIL INVESTORS WITH LIMITED RESOURCES
FROM FILING CLAIMS—IT IS UNCONSCIONABLE AND UNENFORCEABLE…...37**

**CAUSES OF ACTION...........................................................................................................39**

**PRAYER FOR RELIEF .......................................................................................................50**

**DEMAND FOR JURY TRIAL**................................................................................................**47**

Plaintiffs Alec Ohanian, and Artin Ohanian ("Plaintiffs") allege the following against Stablegains, Inc. ("Stablegains") based on personal knowledge, the investigation of counsel and information and belief.

## INTRODUCTION

1. Launched in August 2021 and located in Middletown, Delaware, Stablegains, Inc. is an investment platform which promised users a 15% yield on their deposits by investing the deposits in "safe" assets that could be used to earn substantial returns.

2. Unbeknownst to its depositors, Stablegains, by and through its founders, Emil Dalgard and Kamil Ryszkowski, diverting the entirety of its depositors' funds, without depositors' knowledge or consent into Anchor Protocol.

3. Anchor Protocol is a platform generated interest payments for holders of UST, an "algorithmic stablecoin" developed by Terraform Labs ("TFL").

4. UST is an "algorithmic stablecoin" created and centrally controlled by Terraform Labs ("TFL"), a crypto-asset company based in Singapore that is run by its founder and CEO Kwon Do-hyung ("Do Kwon"). The value of UST depends on and is derivative of the value of "LUNA," another crypto asset developed and centrally controlled by TFL.

5. UST was advertised and sold to investors as a "safe" asset that could be used to earn substantial returns, including in the form of interest. The respective prices of UST and LUNA both depended upon, and continue to depend upon, the efforts and success (or failure) of TFL. For example, the amount of interest that investors earned from UST depended directly upon the success (or failure) of TFL's efforts in maintaining the Anchor Protocol.

6. As an early supporter of and investor in TFL, Stablegains is intimately familiar with UST and LUNA. In fact, Stablegains, Inc. falsely advertised UST as a safe investment.

7. In a blog post published by the Company in August 2021, Stablegains claimed that "Anchor's deposit interest rate usually oscillates between 18% and 20%. Stablegains pays its customers 15% and pockets the difference for handling "the technicalities of accessing Anchor on [users'] behalf" and covering transaction fees incurred when accessing Anchor".

8. Despite enjoying those fantastic profits, Stablegains plainly failed to comply with federal and state securities laws. Stablegains failed to disclose that UST is in fact a security, and that it is investing its depositors' funds in these securities, even though (i) there is no registration statement in effect for them, and (ii) Stablegains, inc. itself has refused to register with the U.S. Securities and Exchange Commission ("SEC") either as a securities exchange or as a broker-dealer.

9. Stablegains' failure to comply with the securities laws, and its false advertisements of UST, have led to disastrous consequences for Stablegains' customers: in May 2022, in the span of just a few days, UST lost essentially all its value—a loss of approximately $18 billion. Investors who had deposited millions of dollars with Stablegains quickly learned that contrary to Stablegains' advertisements, UST was not "safe," "stable," or "fiat-backed."

10. Since the collapse of UST, Stablegains has dramatically altered its website and promotional FAQs touting UST as "safe" and "fiat-backed," effectively conceding that UST was none of those things.

11. Adding insult to injury, Stablegains has not completely liquidated the assets it held in the form of UST to return these funds to its depositors. In fact, Stablegains has retained the majority of the devalued assets deposited by its users, unilaterally opting to redirect them into Terra 2.0, a new iteration of cryptocurrency on the Terra blockchain.

12. The securities laws exist to protect investors. These laws were enacted, as the Supreme Court has explained, "[i]n the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry" and "embrace a fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor." Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 170–71 (1994) (cleaned up). 13. In short, if Stablegains, Inc. wants to enjoy the many benefits of operating in the U.S. market, it must comply with U.S. federal and state securities laws. Yet, Stablegains has chosen not to do so. Even though UST and LUNA are both securities, neither is registered with the SEC nor any state regulator. As a result, purchasers do not have access to the disclosures that accompany the issuances generally required of publicly traded securities—the precise disclosures designed to avoid a repeat of the 1929 stock market crash and the Great Depression that followed.

13. Stablegains has also failed to register under federal or state law as a securities exchange, which it is. As to UST and LUNA, there is no doubt that they are securities. Stablegains' failure to comply with the securities laws critically enables bad actors like TFL to harm investors. In fact, the entire business model of Stablegains is premised on enabling these bad actors: Stablegains directly profits from every dollar which its investors deposit, and therefore has a stark incentive to stake funds in Anchor Protocol irrespective of their compliance with the securities laws. From Stablegains' perspective, the less disclosure,

the better, as more disclosure about the riskiness of crypto-assets will predictably lead investors to deposit less funds with the platform.  Accordingly, because Stablegains' redirection of depositors' funds into UST violates both federal and state law,  Plaintiffs bring the following claims to recover damages, deposits made into the Stablegains platform, together with interest thereon, as well as attorneys' fees and costs, to the fullest extent permitted by law.

## PARTIES

14. Plaintiffs Alec Ohanian and Artin Ohanian are residents of California.  Plaintiffs deposited funds into the Stablegains platform.

15. Defendant Stablegains, Inc. is a Delaware corporation headquartered in Middletown, Delaware, that operates under the name "Stablegains".

16. Subject matter jurisdiction of this Court is further proper under 28 U.S.C. § 1331 because Plaintiff asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77l(a)(1), 77o.

17. The Court has personal jurisdiction over Defendant. Defendant transacted business, maintained substantial contacts, and, committed overt acts in this District in furtherance of the violations of the securities laws described in this Complaint.

18. Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 5, 15(a)(1) and 29(b), 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b).

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendant transacts business in, are found in, and/or have agents in this

District, and because some of the actions giving rise to this Complaint took place in this District.

**FACTUAL ALLEGATIONS**

I.  **BACKGROUND ON CRYPTO-ASSETS, CRYPTO-ASSET EXCHANGES AND STABLEGAINS, INC.**

   A.  **The Blockchain and Crypto-Assets Generally**

20. By way of background, this case concerns crypto-assets. Crypto-assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. 26. Bitcoin was the world's first major crypto-asset. Although the potential of fully digital assets had previously been recognized, Bitcoin's novel architecture provided three key traits that enabled it to succeed: It is a secure medium of exchange, it is "mined," and it is decentralized.

21. This decentralization distinguishes Bitcoin from other assets. For example, the value of corporate stocks and bonds, regardless of their structure, is tied to the success of the issuing corporation. The value of government bonds is tied to the credit of the government that issues them.

22. The value of a currency is tied to the issuing nation, reflecting factors like its economy, political stability, and the practices of its central bank. None of this is true for cryptocurrencies.

23. The blockchain has become the foundational technology for crypto-assets. While

24. crypto-assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable.

25. Control of crypto-assets is attested primarily through cryptographic keys. These cryptographic keys have two components: a public key and a private key. This

cryptographic system of transfer and exchange is generally the same across most crypto-assets.

26. To use Bitcoin as an example, the public key is used to produce the Bitcoin address.

27. As with the account number of a conventional bank account, a Bitcoin address is a destination for transfers of Bitcoin. Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters, such as 1s5F or R3w9. As with a lengthy PIN or password for a conventional bank account, a private key allows the owner of a Bitcoin address to access his or her Bitcoin.

28. Just as one transferring funds to a conventional bank account needs to know the account number for that account, those who wish to transfer Bitcoin need to know the recipient's Bitcoin address. With the recipient's address, a transferor can use his or her private key to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

29. A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is, anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are neither recorded on the blockchain nor are they accessible to the public.

**B.  Stablecoins**

30. The advent of Bitcoin in 2009 introduced the promise of a decentralized and programmable form of digital money. The value of many crypto-assets, however, is highly volatile, which can be an undesirable feature for a medium of the exchange.

31. A "stablecoin," as the name implies, is a digital asset whose value is supposed to be stable, not volatile. A stablecoin is designed to maintain a consistent value relative to one or more assets, such as a fiat currency (e.g., the U.S. dollar, the Euro, the Japanese yen etc.) or debt obligations (e.g., short-dated U.S. government obligations). Potentially unlike the underlying asset (e.g., if that asset is a debt obligation), the stablecoin in theory can be transferred between parties across borders instantaneously with minimal transaction cost.

32. One of the first stablecoins, Tether (also known as "USDT"), illustrates that the promises of the backers of stablecoins do not always match reality. Launched in 2014, Tether Holdings Ltd. (the company that issues USDT) originally claimed that each USDT minted would "be backed one-to-one by a fully auditable reserve of [U.S.] dollars." Ostensibly, a USDT holder could exchange his or her USDT for an equal number of U.S. dollars.

33. Regulators and the investing public, however, have expressed significant concern over whether USDT is truly backed by an equal number of dollars. Indeed, in 2021, the Commodities Futures Trading Commission ordered Tether Holdings to pay $41 million in penalties because "from at least June 1, 2016 to February 25, 2019, [the company] misrepresented to customers and the market that [it] maintained sufficient U.S. dollar reserves to back every USDT."

34. There are now many stablecoins in circulation that purport to be backed by different types of assets. By June of 2022, the market capitalization of all stablecoins was more than $152 billion.

### C.  Algorithmic Stablecoins

35.  Whereas most traditional stablecoins are backed by non-digital assets, "algorithmic stablecoins" are a special type of stablecoin that typically consist of an arrangement with a second digital asset, with the relationship between the two tokens managed through an algorithm in such a way that the stablecoin should remain pegged to its reference asset (such as the U.S. dollar).

36. For example, a given algorithmic stablecoin may purport to be worth $1 dollar. The issuer of the algorithmic stablecoin, however, does not itself hold dollars for which the algorithmic stablecoin holders can exchange the stablecoin. Instead, the algorithmic stablecoin's value is kept pegged to the dollar by reference to a second digital asset. At a high level, the algorithm underlying the algorithmic stablecoin monitors the price of the underlying digital asset and constantly acts (by increasing or decreasing supply) to keep the price of the stablecoin pegged to the dollar. The algorithm's promise, therefore, is to keep the price stable.

37. In the case of the algorithmic stablecoin UST—the subject of this lawsuit—TFL purported to keep the value of UST pegged to $1 stabilized through a system of supply control and profit-taking arbitrage incentives related to LUNA.

## II.    THE TERRA (LUNA/UST) ECOSYSTEM

### A.  The Creation of the Terra Ecosystem

38. UST and LUNA are crypto-assets that exist as part of a broader Terra ecosystem that was centrally developed by TFL and, among others, TFL's founders Do Kwon and Daniel Shin. The Terra ecosystem has come to encompass numerous "decentralized applications" or "dApps" and protocols, such as the Anchor Protocol—a lending and borrowing platform—and the Mirror Protocol—a platform for trading "mirrored" or

synthetic assets, including U.S. stocks traded on major U.S. exchanges (the Mirror Protocol is the subject of an ongoing SEC investigation).

39. Do Kwon is a 30-year old South Korean computer science graduate of Stanford University. He worked at Microsoft and Apple before becoming what the New York Times calls a "trash-talking crypto founder" responsible for the ultimate crash of UST and LUNA. Do Kwon earned that notoriety through taunts aimed at his critics such as: "I don't debate the poor." In addition to LUNA/UST, Do Kwon is also responsible for the launch of another failed algorithmic stablecoin project, Basis Cash.

40. Shin is a graduate from the University of Pennsylvania's Wharton School and was described by TFL as "one of the best known entrepreneurs and investors in East Asia." Shin eventually left TFL.

41. The first step in the tokenization of the Terra ecosystem was the launch of LUNA, the "native" digital asset of the Terra blockchain. Do Kwon has called LUNA his greatest invention.

42. TFL has described LUNA "as the native staking asset from which the family of Terra stablecoins derive their stability, utility, and value, acts both as collateral for the entire Terra economy and as a staking token that secures the PoS network. Luna can be held and traded as a normal crypto-asset but can also be staked to accrue rewards in the network generated from transaction fees. Luna can also be used to make and vote on governance proposals."

43. TFL has advertised LUNA as "backed by" by the parent company of Binance U.S., which Plaintiff refers to as "Binance-Asia." Binance-Asia invested in TFL and received LUNA tokens in exchange, the value of which eventually reached $1.6 billion.

44. In April 2019, Do Kwon and several co-authors released the promotional "Terra whitepaper," which describes the plan to create "Terra Money" in the form of an algorithmic stablecoin that, when pegged to the U.S. dollar, would become UST.

45. In September 2020, Do Kwon announced the launch of UST through the secondary crypto-asset exchange Bittrex Global. Do Kwon touted UST as "the first decentralized stablecoin that is scalable, yield bearing and interchain." Trumpeting the growth potential of UST, Do Kwon compared UST to a different Terra stablecoin pegged to the South Korean Won, observing that that stablecoin "has been exploding in growth and adoption in Korea, and is today the most actively adopted stablecoin by usership." Do Kwon explained that UST was a "yield bearing" asset and promoted "the upcoming launch of Anchor, a savings protocol offering stable yield on Terra stablecoins" such that "[UST] will soon be the first censorship-resistant dollar to offer a savings experience competitive with the traditional savings account through Anchor."

B.   **The Interrelationship Of UST/LUNA As Part of An Economic Scheme**

46. UST and LUNA are part of a single economic scheme or arrangement. In publicly available informational videos that have been viewed hundreds of thousands of times, TFL describes the way that UST and LUNA work together as a series of understandings, transactions, and contracts. According to TFL, UST is built on Terra's blockchain. The price of one UST is determined by how many people want it, and by how much UST is available. Let's imagine the entire Terra economy as a pool. The size of the pool is determined by the total supply of UST. If more people want UST the tide rises, and if less people want UST the tide falls. The height of the pool represents the value of each UST. If you can do more with UST, like buy coffee or invest in stocks, more people will want

to buy UST driving up its price. To bring back the water level to one dollar, we can expand the pool by introducing a new supply of UST. But where does new UST come from?

47. According to TFL, the central feature of UST as an "algorithmic" stablecoin lies in its guaranteed exchangeability with LUNA and corresponding supply control: At Terra we've designed a machine that swaps one dollar worth of Luna to one UST. Investors who predict UST will be more useful and used in the future can buy and hold Luna. When the value of UST rises above one dollar, any Luna holder can swap one dollar worth of Luna for one UST and sell each UST for more than a dollar, making a profit. The newly introduced UST expands the pool, bringing its price back to the one dollar peg. Now, Luna is more scarce and therefore more valuable.

48. Put differently, the LUNA/UST pair was marketed as follows: when the price of UST goes above $1 due to increasing demand, the Terra algorithm stabilizes the price by allowing LUNA holders to mint (i.e., create more) UST—which increases its supply—by exchanging $1 of LUNA - which is burned (i.e., removed from circulation) to reduce LUNA supply. The trader is incentivized to make that exchange because she can then sell her newly-minted UST for more than $1 at a profit. Similarly, when demand for UST decreases, causing its price to go below $1, holders of UST are incentivized by the arbitrage opportunity to mint $1 of LUNA (which increases its supply) in exchange for UST (which also decreases UST's supply). At least this was the marketing.

49. TFL also purported to ensure that UST would be a source of profits through arbitrage, stating: "During times of contraction, any UST holder can profit by swapping UST for Luna raising the price of one UST back to one U.S. dollar. As UST becomes more useful

in the long run, Luna holders are rewarded for assuming the risk of short-term price volatility." 59. Besides arbitrage, the Terra ecosystem also relies upon "seigniorage," which refers to the profit that a currency-issuer (traditionally, a government) makes through the issuance of the currency. Although issuers of traditional currencies typically incur certain transaction costs that reduce their seigniorage and incentive to issue currency, the Terra whitepaper makes clear that, because UST and LUNA are created from thin air, there is no seigniorage cost to the ecosystem. Indeed, according to the Terra whitepaper, seigniorage is "the value of newly minted currency minus the cost of issuance (which in this case is zero)." 60. Fiat currency seigniorage reverts to the government; for UST/LUNA seigniorage, reverts to the "community." As the Terra whitepaper explains: "So how exactly does the machine work? When Luna is swapped for UST, a certain percentage is burned and the rest piles up in a community pool. From the other end, new UST is printed. This process is called seigniorage. As more applications are built using UST massive demand will cause price to deviate above the one dollar peg, meaning we need more Luna swapped for UST to expand supply."

50. Through seigniorage, TFL explains: "Luna becomes more and more valuable, and the community pool accumulates more funds. The funds in the community pool are reinvested to build more apps that use UST, and the virtuous cycle of growth continues. Investors who hold Luna see its value rise during times of expansion, and if they choose to stake earn transaction fees in UST. Even when demand for UST is low, Terra's algorithm automatically increases fees so that validators are always rewarded with a steady cash flow of UST." Thus, LUNA allows holders to "earn passive income."

51. According to TFL, LUNA holders are entitled to governance rights analogous to the rights associated with a traditional equity security: "Luna holders can participate in Terra's governance process, proposing or voting for changes in transaction fees, seigniorage allocation, tax rate, and many more." Thus, LUNA "collateralizes UST . . . much like the moon—which stabilizes the earth's rotation—Luna and its stakers are essential to Terra's stability."

C. **The Anchor Protocol Created by TFL Formed an Essential Part of the UST/LUNA Economic Scheme.**

52. In July 2020, as Do Kwon had previewed, TFL launched the Anchor Protocol to provide a passive profit-making incentive to UST holders. Nicholas Platias, who was the Head of Research at TFL, announced the launch of the Anchor Protocol as a saving and lending protocol that, he explained, "facilitates depositing and borrowing of Terra stablecoins." Platias elaborated that the Anchor Protocol would "offer depositors a stable return" as a "household savings product powered by cryptocurrency" and the "gold standard for passive income on the blockchain." The Anchor Protocol promised lenders annual percentage yields of nearly 20%, and its total value locked ("TVL") swelled to $17 billion—about 70% of all value in the Terra ecosystem. And in fact, Anchor paid those rates to UST holders, including as of June 6, 2022.

53. Coupled with the Anchor Protocol, investors bought UST in droves, looking to capitalize on the promise of tremendous investment returns that, according to the marketing, was safe. 65. In insults levied at his critics—some of whom accused LUNA/UST of being a Ponzi scheme—TFL and Do Kwon talked a big game, rejecting such accusations. TFL and Do Kwon maintained that the algorithm underlying UST was sound and its reliance on LUNA appropriate and that UST was a safe investment for investors, who should

store UST on the Anchor Protocol to realize fantastic profits. Stablegains echoed such claims, claiming that UST was "safe" and promoting UST and the Anchor Protocol.

> **D. Despite Claiming That the Algorithm Underlying UST Was Sound, TFL Establishes Non-Luna Reserves to Protect the UST Peg.**

54. Perhaps in recognition that UST was in fact susceptible to a "death spiral" in the event of rapidly declining demand in LUNA resulting in a bank run on UST, TFL ultimately decided to depart from the Terra whitepaper's promise of a purely "algorithmic stablecoin" backed by LUNA by relying instead on collateralizing its value through Bitcoin and other non-LUNA reserves. This was prelude to the crash that would wipe out the value of UST.

55. On January 19, 2022, Do Kwon announced the launch of the Luna Foundation Guard (the "LFG" and collectively with TFL and Do Kwon, the "Terra Organization"), an organization "mandated to build reserves supporting the $UST peg amid volatile market conditions" and to "allocate resources supporting the growth and development of the Terra ecosystem" through grants.

56. On March 23, 2022, Jump Trading, one of the investors behind the LFG, proposed a mechanism for how to deploy Bitcoin reserves to prop up UST's price in a crisis.

57. On March 28, 2022, the LFG's Bitcoin wallet address purchased 27,000 bitcoin worth roughly $1.3 billion. Over the next month, LFG continued to buy up Bitcoin reserves to defend the UST peg in the event of a crisis. As a result of these open market purchases by LFG, LUNA's price soared.

58. On April 5, 2022, LUNA reached an all-time high of $119.20.

59. On April 14, 2022, TFL gave LFG 10 million LUNA tokens, which at the time had a value of $820 million.

60. Do Kwon ultimately wanted to build a $10 billion Bitcoin reserve to back UST's peg, stating in March 2022 that this reserve would also be funded by seigniorage: "It's not 10B today - as UST money supply grows a portion of the seigniorage will go to build BTC reserves bridged to the Terra chain[.]" But Do Kwon never reached $10 billion, and the reserves that the Terra Organization had accumulated proved insufficient to ward off the impending depegging of UST and its subsequent crash.

### E.  UST Collapses, Wiping Out Billions of Dollars in Investments

61. By April 4, 2022. LUNA was trading at $116.41, with a market capitalization of over $40 billion.

62. And by May 5, 2022, the market capitalization of UST had reached an incredible $18.73 billion, with much of the UST stored on Anchor, where investors raised incredible passive profits.

63. The collapse of the Terra ecosystem was even more sudden than its rise.

64. On May 7, 2022, the crash of UST began. On that day alone, UST owners swapped $85 million worth of UST for a competitor stablecoin called USDC. 77. On May 8, 2022, following a series of large withdrawals of UST on the Anchor Protocol (and illustrating the central connection between UST and the Anchor Protocol), the price of UST dipped to $0.985, below the $1 peg.

65. On May 9, 2022, UST holders withdrew approximately $5 billion in UST from the Anchor Protocol, reflecting an incredible capital flight. The price of UST fell to $0.35.

66. On May 9, 2022, Do Kwon sought to reassure investors, tweeting: "Deploying more capital – steady lads."

67. By May 11, 2022, the market capitalization of LUNA was just $541 million and its price had declined to $.004.

68. By May 12, over the preceding 24 hours, the price of LUNA had fallen 96%. Without the backing of LUNA, the price of UST crashed to 15 cents.

69. A few days later, LFG confirmed that it had attempted to maintain UST's peg, depleting its Bitcoin reserves from 80,000 Bitcoin (worth approximately $2.883 billion) to just 313 Bitcoin (worth approximately $11.2 million). In other words, LFG had failed in its efforts.

70. By the end of May 2022, the price of UST was down to approximately 1 cent – leaving investors who had purchased and held the supposed stablecoin with losses of approximately 99%.

71. This collapse of UST was devastating for investors, who were made to believe that UST was a "safe" "fiat-backed stablecoin." An incredible number of investors lost much, if not all, of their life savings. As the New York Times noted, "retail traders now grapple with devastating losses" that some have said were caused by the "irresponsible behavior of the institutions backing Mr. Kwon." Stablegains is one of those institutions.

72. The stories of retail investors are horrific, as they had investments wiped out, losing so much on the irresistible promise of endless and safe profit. For example, some investors took out home equity loans to purchase UST and have thus been left severe debt.

73. Other investors were in such despair that they commented in online forums that they were contemplating suicide as a result of the UST/LUNA crash.

74. The harm is not limited just to UST/LUNA investors, because as the New York Times reported, "[t]heir meltdowns had a domino effect on the rest of the cryptocurrency

market, tanking the price of Bitcoin and accelerating the loss of $300 billion in value across the crypto economy." In May 2022, Secretary of the Treasury Janet Yellen even testified to Congress that "TerraUSD experienced a run and declined in value" illustrating that "there are risks to financial stability."

75. The harm suffered as a result of the UST/LUNA scheme cannot be understated—and must be remedied.

### III.   THE SEC HAS REPEATEDLY INSTRUCTED THAT CRYPTO-ASSETS LIKE UST AND LUNA ARE SECURITIES

76. The SEC has repeatedly both provided guidance and engaged in enforcement actions on the basis that crypto-assets are securities. For example., the SEC examined how crypto-assets could qualify as securities under existing law in the SEC's Report of Investigation Pursuant to Section 21(a) of the Securities Act of 1934: The DAO (the "2017 DAO Report").7 In that report, the SEC examined the application of the Securities Act and the Exchange Act to the issuance and trading of crypto-assets.

77. With respect to the application of the Securities Act to crypto-assets, the SEC concluded (1) that crypto-assets may qualify as securities pursuant to the Securities Act and the test articulated in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), and that (2) issuers of crypto-assets that fit within the definition of security under the Howey test are subject to the registration and reporting requirements of the Securities Act.

78. Similarly, the SEC concluded that crypto-asset trading platforms may satisfy the meaning of "exchange" as defined by the Exchange Act if they "provide users with an electronic system that matched orders from multiple parties to buy and sell [digital assets] for execution based on non-discretionary methods." The SEC noted that a "system that meets the criteria of Rule 3b16(a), and is not excluded under Rule 3b16(b), must register as a

national securities exchange pursuant to Sections 5 and 6 of the Exchange Act or operate pursuant to an appropriate exemption."

79. Following a boom of initial coin offerings ("ICOs") in 2017, the SEC issued further guidance as to the application of the *Howey* test to crypto-assets in a 2019 report entitled *Framework for "Investment Contract" Analysis of Digital Assets (the "Framework").[1] The report reiterated that whether a particular crypto-asset is an investment contract, and thus a security, requires an analysis of the facts and circumstances surrounding the crypto-asset's creation and issuance.*

80. Following this guidance, the SEC has engaged in enforcement actions on the basis that several different tokens are in fact securities. On September 30, 2019, Block.one, the issuer of the EOS crypto-asset, agreed to pay $24 million to settle charges that it had raised several billion dollars through an unregistered securities offering when it conducted the ICO for the EOS token. Similarly, on December 22, 2020, the SEC brought charges against Ripple Labs Inc. and two of its executives, alleging that they had raised over $1.3 billion through an unregistered crypto-securities offering through the ICO of XRP.

81. On July 21, 2021, speaking to the American Bar Association, SEC Chairman Gensler commented on the fact that digital asset platforms were offering tokens that are priced off of securities and resemble derivatives, stating "Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets,* SECURITIES AND EXCHANGE COMMISSION (Apr. 3, 2019), https://archive.ph/4wS5f (the "*Framework*").

product that provides synthetic exposure to underlying securities. These platforms—whether in the decentralized or centralized finance space—are implicated by the securities laws and must work within our securities regime."

## IV.   UST IS AN UNREGISTERED SECURITY

82. Although unregistered, UST is a security because it is an investment contract, or, in the alternative, because it is a derivative product of LUNA. The first bona fide public offering of UST occurred on or about September 2020.

### A.  UST Is An Investment Contract

83. Analysis of the facts and circumstances surrounding UST tokens shows that they are investment contracts under *Howey* and are therefore securities. Under *Howey*, a contract, transaction, or scheme is an investment contract if it involves (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) from the essential efforts of another. UST tokens involve contracts, transactions, and schemes, including a series of understandings, transactions, and undertakings, that when viewed as a whole, amount to a security.

*i.  UST Purchasers Made an Investment of Money*

84. Purchasers of UST, including through Stablegains, Inc., acquired UST in an exchange of value. As the SEC has noted in the *Framework*, the "first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

*ii.   UST Purchasers Invested in A Common Enterprise*

85. Purchasers of UST, including through Stablegains, Inc., understood that they were investing money in a common enterprise. TFL pooled the money received from UST purchasers and seigniorage, and then used it to develop the Terra ecosystem as well as maintain and expand it. Each UST token is fungible with all others, and the fortunes of all UST investors are "linked to each other [and] to the success of [the Terra Organizations'] efforts." Indeed, the SEC has stated that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."

86. The Terra whitepaper explained that the fortunes of UST users were linked together, since "a medium of exchange is mainly driven by its network effects" and thus in order to succeed it had to "to maximize adoption in order to become useful." The Terra whitepaper, entitled "Terra Money: Stability and Adoption," observes a critical difference of UST compared to other crypto- assets was the "clear plan for the adoption" for UST that TFL had developed. As Do Kwon emphasized, the central premise of UST is that all of the fortunes of UST holders are linked with the success of the Terra ecosystem, since "currencies are ultimately backed by the economies that use them".

87. Indeed, during the beginning of the crash of UST/LUNA, TFL emphasized that, "MFers we are the peg," meaning that the success of UST and LUNA investors is linked with each other and with the Terra ecosystem itself.

88. The Terra whitepaper also explained that the fortunes of UST investors were linked to the success of the overall enterprise and to the fortunes of TFL and the Terra network's developers and promoters. The whitepaper makes clear that, in order to drive the adoption of the Terra network and UST, the protocol would have a "growth-driven fiscal

policy" relying upon incentivizing the development of "Terra Platform DApps [that] will help to drive growth and stabilize the Terra family of currencies by diversifying its use cases." The Terra whitepaper explains further that a "portion of seigniorage goes to the Treasury to fund fiscal stimulus" to create "strong incentives for users to join the network with an efficient fiscal spending regime, managed by a Treasury, where multiple stimulus programs compete for financing . . . they will be financed with the objective to increase adoption and expand the potential use cases." Indeed, "on average 50% of seigniorage is granted to the Treasury" and thus "returning seigniorage not allocated for stability back to its users." Further, when Do Kwon announced the creation of the LFG on January 19, 2022, he specified that it would "allocate resources supporting the growth and development of the Terra ecosystem" through grants.

89. As such, purchasers of UST tokens were investing in a common enterprise.

        *iii.   UST Purchasers Had a Reasonable Expectation of Profits*

90. Investors in UST, including purchasers of UST through Stablegains, Inc. reasonably expected to receive profits from their investment in UST in multiple ways.

91. For example, as Terra's whitepaper makes clear, purchasers of both UST and LUNA expect to earn profits through arbitrage. The Terra algorithmic stablecoin system is premised on the ability of LUNA and UST holders to "extract risk-free profit" from arbitrage opportunities between the price of LUNA and UST.

92. The Terra whitepaper also explains that the Terra blockchain relies upon a Proof of Stake protocol that creates "predictable rewards in all economic conditions." The Terra ecosystem accomplishes this profit-earning incentive by making it so that "[a]ll Terra

transactions pay a small fee to miners" and through seigniorage, which means that the protocol "burns a portion of earned Luna, which makes mining power scarcer."

93. And purchasers of UST had a reasonable expectation that they would be able to earn profits through staking on the lending the Anchor Protocol. As of April 22, 2022, shortly before the UST/LUNA crash, an astonishing 72 percent of all UST was deposited on the Anchor Protocol to earn approximately 20% interest on deposits—an interest rate that has been called "nuts." Stablegains, Inc. enticed users to make deposits by promising users a "risk-free" return of 15 percent, retaining the remaining 5 percent for themselves. These promotions gave Stablegains users a reasonable expectation of profits.

94. Indeed, there are few, if any, goods or services that can be directly purchased using UST. Accordingly, all or nearly all UST traded through Stablegains, Inc. is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

*iv.   UST Purchasers Expected Profits in Reliance Upon the Efforts of Others*

95. The *Framework* provides that reliance on the efforts of others prong under *Howey* is likely to be met where "there are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a 'decentralized' network)." Such efforts might include "actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, though, for example, buybacks, 'burning,' or other activities." Investors in UST undoubtedly expected their profits to derive from the efforts of the Terra Organization.

96. Further, with respect to the Anchor Protocol, TFL also took actions to support the market price of UST by working to ensure that purchasers of UST could make enormous profits through the Anchor Protocol. In February 2022, TFL intervened to inject $450 million worth of UST into the Anchor Protocol's reserves to ensure that the Anchor Protocol could "tap into its reserves in order to pay lenders the promised yield" despite dwindling borrowing demand. As Do Kwon tweeted at the time, TFL had ensured that the Anchor Protocol was "funded"—thereby guaranteeing UST purchasers' reasonable expectation of profits.

97. The Terra Organization also consistently represented that UST represented "decentralized money" with Do Kwon tweeting, "Five years ago, when I had the idea to create decentralized money for decentralized blockchains, all of crypto was running on centralized stablecoins. Since then, the algorithmic stablecoin category created by $UST has become industry standard".

98. And Do Kwon and TFL advertised that UST represented "decentralized money."

99. In reality, TFL acts as a centralized responsible actor performing essential tasks for the Terra ecosystem, including supporting the price of UST.

100. For example, TFL performed tasks that were essential to the Terra ecosystem in its role in creating and maintaining "Terra Station" through which purchasers of UST and LUNA are able to "create a wallet, stake LUNA, send tokens, and participate in governance." Indeed, much of the functionality of the Terra ecosystem and Terra-backed tokens, including UST and LUNA, is directly provided by TFL.

101. In addition, a *Framework* factor going to the reasonable expectation of profits is "[t]he availability of a market for the trading of the digital asset, particularly where the

AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset." TFL marketed the availability of a secondary market for UST; indeed, TFL launched UST on a secondary market. For example, TFL retweeted the listing announcement of UST by secondary exchanges:

102.     Still further, the Terra Organization ultimately decided to depart from the Terra whitepaper's promise of an "algorithmic stablecoin" relying on its exchangeability with LUNA to maintain its 1:1 dollar peg. Instead, the Terra Organization decided to provide additional support for the dollar peg of UST by collateralizing its value through Bitcoin reserves, as noted above.

103.     Once UST was backed by Bitcoin, the price of both UST and LUNA undoubtedly became dependent on the efforts of LFG. For example, once UST was backed by Bitcoin, and UST went off its peg, LFG attempted to reestablish the peg by selling its Bitcoin holdings to inject liquidity into the market for UST. Underscoring the enormity of its intervention, on May 5, 2021, TFL and LFG announced that they had acquired approximately $1.5 billion in Bitcoin reserves.

104.     But even that was not enough. Further illustrating the interconnectedness of LFP and TFL with each other and to LUNA and UST, LFG defended the UST peg through the efforts of TFL, which "managed & executed all finance, administrative, & operational functions & support" on behalf of LFG to execute the trades.

105.     As described further above, LFG was forced to sell a substantial portion of its Bitcoin holdings at a substantial loss to save the plummeting UST, which fell from $0.995 to $0.60 in a matter of hours, causing LUNA to fall more than 50% on the same day. In the midst of the crash, Do Kwon made clear that it was the centralized efforts of

the Terra Organization's infusion of new capital that was propping up the UST peg, which users on Twitter rightly noted at the time contradicted the Terra Organization's claims of decentralization.

106.        Ultimately, LFG's sale of billions of dollars in Bitcoin was a failed effort to reestablish the 1:1 USD to UST peg, with Do Kwon admitting that all but 313 Bitcoin had been used to defend the price of UST.

107.        Over the next several days, LUNA declined in value to $0.00001 (from a high of over $119). Do Kwon has conceded that these efforts demonstrated that the Terra ecosystem never achieved decentralization and was reliant on the managerial efforts of the Terra Organization.

108.        That TFL was always, under the Framework, "performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality" is also clear from its other actions during the UST/LUNA crash.

109.        TFL unilaterally halted the Terra blockchain during the UST/LUNA crash to buy time "to come up with a plan to reconstitute" the Terra network. TFL restarted the Terra blockchain once it had provided a software update to avoid attacks against the network in the wake of the collapse of UST and LUNA. TFL made clear that its efforts were to try to "stop the bleeding" of UST—in other words, to try halt UST from depegging from the dollar.

110.        These actions demonstrate that UST was only ever valuable if the team behind TFL, including the LFG and the core team of technology developers, committed the managerial efforts needed to develop, maintain, and promote the Terra network and its underlying algorithms. As Do Kwon has admitted, UST derives its value from the

network, such that even if UST did not exist, the network itself would be "worth preserving".

111.     Based on the foregoing facts, among others, UST is an investment contract and therefore a security. However, UST has never been registered as a security.

**B.    UST Is Also an Unregistered Security Because It Is a Derivative of LUNA, Another Unregistered Security.**

112.     Independently, UST is also a security because it is a derivative of another security— namely, LUNA. This conclusion is consistent with the August 3, 2021, remarks of SEC Chairman Gensler before the Aspen Security Forum that "a stable value token backed by securities . . . [is] subject to the securities laws and must work within our securities regime."

113.     UST is backed by LUNA. UST is intended to maintain its 1:1 dollar peg through its exchangeability for $1 of LUNA. As described in the Terra whitepaper, "Luna also serves as the most immediate defense against Terra price fluctuations" such that "[w]hen TerraSDR's price < 1 SDR, users and arbitragers can send 1 TerraSDR to the system and receive 1 SDR's worth of Luna." The Terra whitepaper also describes how the "system finances Terra price making via Luna" through the minting and burning of LUNA in response to exchanges for UST—in this way, "volatility is moved from Terra price to Luna supply." Given that the value of UST is backed by a security, LUNA, UST is also a security.

114.     UST is also an option to purchase LUNA. As the Terra whitepaper explains, "[t]he system uses Luna to make the price for Terra by agreeing to be counter-party to anyone looking to swap Terra and Luna at Terra's target exchange rate." That is,

purchasers of UST are purchasing the right to buy LUNA at a specified price. An option to purchase a security is likewise a security.

115.        LUNA is also a security because it meets the Howey test for an investment contract. Many of the reasons that LUNA is a security are explained above in Section IV.A, supra. To avoid repetition, Plaintiff incorporates those paragraphs by reference and adds the following for clarity:

i.    *LUNA Purchasers Made an Investment of Money*

116.       Investors purchase LUNA through an investment of money—i.e., they exchange value to acquire LUNA.

ii.    *LUNA Purchasers Invested in A Common Enterprise*

117.       Purchasers of LUNA also invest in a common enterprise. TFL pooled the money received from LUNA purchasers and seigniorage, then used it to develop the Terra ecosystem as well as to maintain and expand it. Each LUNA token is fungible with all others, and the fortunes of all LUNA investors are "linked to each other [and] to the success of [the Terra Organizations'] efforts."

118.       LUNA was marketed as deriving value from its ability to act as a governance token of the Terra blockchain. This governance right, which resembles the voting rights of many traditional securities, means that LUNA purchasers participated in a common enterprise with each other and depended on the managerial effort of the issuer in creating and maintaining the algorithms supporting UST and LUNA, as the governance is only valuable if the Terra blockchain is maintained.

<em>iii.        LUNA Purchasers Had a Reasonable Expectation of Profits</em>

119.        Purchasers of LUNA had a reasonable expectation that they would profit from their investment. That expectation was driven by the promotion of LUNA by the Terra Organization.

120.        First, like UST purchasers, LUNA purchasers also expected to make profits through arbitrage. The algorithmic Terra stablecoin system is premised on the ability of LUNA and UST holders to "extract risk-free profit" from arbitrage opportunities between the price of LUNA and UST.

121.        Second, LUNA purchasers also expected to make profits through mining rewards. Purchasers expected they would be able "to stake a native cryptocurrency Luna to mine Terra transactions." It was so important for Terra that LUNA be able to be mined profitably, that the Terra whitepaper explained the profit potential of staking LUNA in mathematical terms.

$$P(t) = \frac{TotalRewards(t)}{LunaSupply(t)} - UnitMiningCost(t)$$

122.     A purpose of the Terra protocol was to ensure that this formula would be positive no matter what over time. As the whitepaper states: "the protocol creates predictable rewards in all economic conditions." (emphasis in original). Indeed, the Terra whitepaper—based on a series of assumptions about transaction volume, fees, and LUNA burn rate—estimated a 15% annual increase in rewards for staking LUNA. The whitepaper also graphically illustrated the phenomenal returns LUNA investors could expect:



123.     Do Kwon marketed the profits LUNA investors enjoyed, touting in the months before it crashed that LUNA was returning $4 billion in dividends "collected entirely by fees" and with "no inflation".

124.     Third, LUNA investors expected LUNA's market price to appreciate. The Terra Organization actively encouraged secondary trading of investors speculating on the price of LUNA. For example, in the weeks before the crash of UST/LUNA, when someone questioned the price of LUNA on the basis that the Terra ecosystem was a "Ponzi scheme" and UST was not adequately collateralized, Do Kwon cavalierly dismissed the concerns.

*125.*     And, until its sudden crash, the price of LUNA increased rapidly to a high of approximately $119 per token.

*126.*     There are few, if any, goods or services that can be directly purchased using LUNA. To the extent that LUNA can be directly exchanged for any goods or services, there is little or no apparent correlation between the market price of those goods or services and the price of LUNA. Accordingly, all or nearly all LUNA traded on secondary exchanges is not used for any direct utility, and is instead traded among users who anticipate profiting thereby.

> iv.     *LUNA Purchasers Expected Profits in Reliance on The Efforts of Others*

*127.*      LUNA purchasers relied upon the centralized managerial efforts of the Terra Organization to realize the profits that they expected from LUNA.

*128.*     First, LUNA purchasers expected to receive a portion of the transaction fees of LUNA processed on the Terra network. The Terra whitepaper makes clear that "rewards from fees tend to increase when the economy grows and tend to decrease when the economy shrinks." LUNA purchasers relied upon the efforts of the LUNA organization to expand the Terra "economy" such that their fees would grow. As discussed above, a portion of LUNA seigniorage "goes to the Treasury to fund fiscal stimulus" which is "used as an efficient stimulus to drive adoption."

*129.*     Second, as discussed above with respect to UST, TFL performed tasks that were essential to the Terra ecosystem and LUNA's value through its role in creating and maintaining Terra Station.

*130.*     Third, as discussed above with respect to UST, the Terra Organization's attempt

to back the UST 1:1 peg to the dollar through collateral reserve other than LUNA was a

centralized effort meant to prop up the price of LUNA. When that centralized effort

failed, the price of LUNA accordingly crashed, illustrating that LUNA purchasers were

completely dependent upon the Terra Organization's efforts to maintain LUNA's market

value.

*131.*     Fourth, following the crash of UST/LUNA, TFL made clear that without its

centralized managerial efforts, the Terra network's infrastructure would have been unable

to support LUNA on an ongoing basis (called "LUNA classic" following the crash).

*132.*     Fifth, TFL marketed the availability of a secondary market for LUNA. For

example, Do Kwon retweeted the listing announcement of LUNA by secondary

exchanges.

*133.*     Based on the foregoing facts, among others, LUNA is an unregistered security.

And UST is accordingly an unregistered security as a derivative of LUNA.


**V.     STABLEGAINS, INC. ILLEGALLY USED SUBSCRIBER FUNDS TO
PURCHASE UST FOR STAKING ON ANCHOR PROTOCOL EVEN
THOUGH IT IS NOT REGISTERED AS AN EXCHANGE, IN VIOLATION
OF THE SECURITIES LAWS.**

134.     Stablegains, Inc. satisfies the criteria of Exchange Act Rule 3b-16(a) and is not

exempt under Rule 3b-16(b). Stablegains, Inc. brings together the funds of multiple

buyers and sellers. Stablegains, Inc. also transmits and manages digital asset buy and sell

orders for UST using funds deposited by its consumers. With absolutely no transparency,

Stablegains, Inc. executed trades purchasing UST in order to stake the digital stablecoins

on Anchor Protocol. Stablegains, Inc. never disclosed the inherent risks associated with

its purchases of UST, or its staking activities related to Anchor Protocol, thereby
misleading its investors. Stablegains users were never informed of its true trading
activities involving the UST/LUNA securities, or the staking of these securities on the
Anchor Protocol Platform.

135.     Stablegains, Inc. is thus an "organization . . . which . . . maintains [and] facilitates
transactions involving digital assets. As the crypto-assets Stablegains, Inc. purchased
with its depositors' funds are securities, Stablegains, Inc. meets the statutory definition of
an exchange under the Exchange Act.

## VI.     STABLEGAINS, INC. PURCHASED THE UST SECURITY USING DEPOSITOR FUNDS EVEN THOUGH IT IS NOT REGISTERED AS A BROKER-DEALER, IN VIOLATION OF THE SECURITIES LAWS.

136.     Stablegains, Inc.'s activities further meet the definition of a "broker-dealer" under
the Exchange Act because Stablegains, Inc. acts as both a broker and a dealer.

137.     The Exchange Act defines "broker" in relevant part as an entity that is "engaged
in the business of effecting transactions in securities for the account of others." Id. §
78c(a)(4)(A). In addition, an entity is a broker if it assists issuers with structuring a
securities offering, identifies potential purchasers, or advertises a securities offering.
Stablegains, Inc.'s activities with respect to UST meet either criterion.

138.     Stablegains, Inc.'s activities also meet the Exchange Act's definition of "dealer",
which includes entities that are "engaged in the business of buying and selling securities .
. . for such person's own account," insofar as such transactions are part of that person's
"regular business." 15 U.S.C. § 78c(a)(5)A). During the Class Period, Stablegains, Inc.
operated as a dealer as defined by the Exchange Act by, inter alia, (1) buying or selling
securities on a continuous basis and as willing to provide liquidity to the market for UST;

(2) maintaining custody over Stablegains, Inc. customers' UST; (3) by providing customers services such as allowing purchase of UST on credit; (4) by having a regular turnover inventory of UST; (5) by purchasing UST for accounts in Stablegains, Inc.'s name (often at a discount); and (6) selling UST to investors for profit immediately or at a later time after being held in inventory.

## VII.   STABLEGAINS INC.'S WITHDRAWAL RELEASE SCHEME IS PUNITIVELY DESIGNED TO DISCOURAGE RETAIL INVESTORS WITH LIMITED RESOURCES FROM FILING CLAIMS—IT IS UNCONSCIONABLE AND UNENFORCEABLE

139.     The crypto-revolution has purported to be retail investor friendly. Major crypto-exchanges, including Stablegains, Inc. are at the forefront of promoting crypto-assets as easy to access, safe, and favorable for the common investor. The underlying theme is that, unlike traditional institutions, crypto-exchanges care about and take care of their customers.

140.     The reality is very different from the narrative. Major crypto-exchanges routinely impose harsh, unconscionable terms on investors that include draconian purported limitations on liability, one-sided arbitration provisions intended to deprive investors of their day in court, and multi-step informal dispute resolution procedures so convoluted and time consuming that they discourage the filing of claims in the first place.

141.     In April 2022, a mere two months ago, the Northern District of California in Bielski v. Coinbase, Inc., invalidated one such unconscionable arbitration scheme imposed by another crypto-exchange, Coinbase, Inc. The arbitration scheme there lacked mutuality: Coinbase's scheme imposed an unfair, burdensome "informal complaint process" only on customers and "no obligation on Coinbase itself to submit its disputes

with users to binding arbitration," meaning Coinbase could file claims in court, while its customers had to arbitrate their claims. 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022) at 4. With respect to the informal complaint process, the Court observed, "Coinbase's tripartite complaint process requires users to jump through multiple, antecedent hoops before initiating arbitration . . . [t]here is no legitimate commercial need for this many burdensome obstacles prior to arbitrating disputes relating to a basic user agreement for services like those provided by Coinbase." Id. at 5.

142.     The waiver provisions that Stablegains, Inc. forced upon its customers, including Plaintiffs, as a prerequisite condition to the withdrawal of their remaining funds, are equally unfair and unconscionable. The Stablegains, Inc. terms of use in (and in effect as of the time Plaintiffs deposited funds) sought to release Stablegains, Inc. from any liability resulting from its reckless and deceitful conduct.  This release of liability scheme is unconscionable and as a result, unenforceable by any conclusion.

143.     Rather than looking to the *Bielski* decision as the impetus to fix its process, or to the recent UST/LUNA catastrophe as a chance to help investors, Stablegains, Inc. unilaterally forced its depositors to accept an unconscionable provision limiting Stablegains, Inc. from liability for its reckless and irresponsible conduct. These provisions are designed to discourage vulnerable customers without any choice to decline, and are thus, unenforceable.

144.     Moreover, following the crash of UST following the "de-pegging" of the stablecoin, Stablegains, Inc. sought to retroactively edit content on its website to limit its exposure to liability. This deceptive conduct further demonstrates that the provisions

retroactively attempting to limit Stablegains, Inc.'s liability are unconscionable and unenforceable.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Offer and Sale of Unregistered Securities
Sections 5 and 12(a)(1) of the Securities Act**

145.      Plaintiffs realleges the allegations above.

146.      Plaintiff brings this claim within three years of the first bona fide public offering of UST. 193. Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

147.      Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." Id. § 77e(c). 195. UST is, and at all relevant times has been, a security within the

meaning of Section 12(a)(1) of the Securities Act. Id. § 77b(a)(1). No registration

statements have been filed with the SEC or have been in effect authorizing Stablegains,

Inc. to act as an exchange, and/or use depositor funds to purchase UST for staking on

Anchor Protocol.

148.      From October 2021 through May 2022, Stablegains, Inc. promoted, solicited, and

purchased  12(a)(1) securities—UST— using depositor funds. Stablegains, Inc.

subsequently staked the stablecoins, which were acquired without the knowledge and/or

authorization of its depositors, on Anchor Protocol, and enriched itself by converting a

portion of the interest earned on the deposits.

149.      Customers on Stablegains, Inc. transact with Stablegains, Inc. itself, and

Stablegains, Inc. is thus a seller of UST.

150.      In addition, by using depositor funds to purchase UST and subsequently staking

the acquired stablecoins on Anchor Protocol, Stablegains, Inc. solicited these purchases,

and in doing so was motivated at least in part by a desire to serve its own financial

interests. Stablegains, Inc. received a direct financial benefit, in the form of the retained

interest funds, from each purchase of UST it conducted using depositor funds.

Stablegains, Inc. further benefitted from purchases of UST because such purchases

supported a liquid trading market for UST, which in turn made the Stablegains, Inc.

platform more attractive to depositors. Stablegains, Inc. thus directly and indirectly made

use of means or instruments of transportation or communication in interstate commerce

or of the mails, to offer to sell or to sell unregistered securities, or to carry or cause such

unregistered securities to be carried through the mails or in interstate commerce for the

purpose of sale or for delivery after sale.

151.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who

offers or sells a security in violation of section 77e of this title … shall be liable … to the

person purchasing such security from him, who may sue either at law or in equity in any

court of competent jurisdiction, to recover the consideration paid for such security with

interest thereon, less the amount of any income received thereon, upon the tender of such

security, or for damages if he no longer owns the security." Id. § 77l(a)(1).

152.    Accordingly, Stablegains, Inc. violated Sections 5(a), 5(c), and 12(a)(1) of the

Securities Act, id. §§ 77e(a), 77e(c), 77l(a)(1). 200. Plaintiffs deposited funds with

Stablegains, Inc. in USD and subsequently suffered overwhelming loss, and hereby seek

damages and interest. See id. § 77l(a)(1).

153.    Plaintiffs hereby offer to tender to Stablegains, Inc. the UST or substantial

equivalent realized upon sale of all UST upon the liquidation of their position in

Stablegains, Inc. In exchange for such tender, Plaintiffs are entitled to recover the amount

of consideration they paid to purchase the tendered UST.


**<u>SECOND CAUSE OF ACTION</u>**

**False Statements and Misrepresentation with Respect to the Sale and Purchase
of Securities
Sections 10(b)-5 of the Securities Act**

154.    From in or about December 2021 through May 2022, Stablegains, Inc., in

connection with the purchase and sale of securities, by use of the means or

instrumentalities of interstate commerce, or of the mails, or of any facility of a national

securities exchange, directly or indirectly, knowingly or severely recklessly used and

employed devices, schemes and artifices to defraud.


PLAINTIFFS COMPLAINT - 41

155.     Stablegains made material misstatement and omissions regarding the safe nature of the investment in its platform, which it knew to be false.

156.     Stablegains knew such statements were false.

157.     Stablegains made the pertinent statements with the intent to manipulate, deceive, and defraud Plaintiffs and to entice such consumers into making deposits into the Stablegains platform.

158.     Plaintiffs deposited funds into the Stablegains service which Stablegains, Inc. in turn used to purchase UST securities.

159.     In depositing the funds, Plaintiffs relied upon the material misstatements and omissions made by Stablegains, Inc.

160.     Plaintiffs suffered catastrophic economic loss as a result of their reliance upon the misstatements by Stablegains, Inc.

161.     By reason of the foregoing, Stablegains, Inc. violated, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) [17 CFR § 240.10b-5(c)] thereunder.

162.     Plaintiffs deposited funds with Stablegains, Inc. in USD and subsequently suffered overwhelming loss, and hereby seek damages and interest. See id. § 77l(a)(1).

163.     Plaintiffs hereby offer to tender to Stablegains, Inc. the UST or substantial equivalent realized upon sale of all UST upon the liquidation of their position in Stablegains, Inc. In exchange for such tender, Plaintiffs are entitled to recover the amount of consideration they paid to purchase the tendered UST.

**THIRD CAUSE OF ACTION**

**Violations of Section 17(a)(1) of the Securities Act**

164.        Plaintiffs reallege Paragraphs 1 through 155 and incorporate them by reference herein.

165.        In or about December 2021,  through in or about May 2022, Stablegains, Inc., in the offer and sale of securities, by the use of instruments of transportation or communication in interstate commerce, or by use of the mails, directly or indirectly, knowingly or severely recklessly employed devices, schemes and artifices to defraud.

166.        By reason of the foregoing, Stablegains, Inc. violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

167.        Plaintiffs deposited funds with Stablegains, Inc. in USD and subsequently suffered overwhelming loss, and hereby seek damages and interest. See id. § 77l(a)(1).

168.        Plaintiffs hereby offer to tender to Stablegains, Inc. the UST or substantial equivalent realized upon sale of all UST upon the liquidation of their position in Stablegains, Inc. In exchange for such tender, Plaintiffs are entitled to recover the amount of consideration they paid to purchase the tendered UST.

**FOURTH CAUSE OF ACTION**

**Contracts to Pay Transaction Fees**
**to an Unregistered Broker or Dealer**
**Sections 15(a)(1) and 29(b) of the Exchange Act**

169.        Plaintiff realleges the allegations above.

170.        Section 15(a)(1) of the Exchange Act makes it unlawful "for any broker or dealer…to make use of ... any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section." 15 U.S.C. § 78o(a)(1).

171.     A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others." Id. § 78c(a)(4)(A).

172.     Stablegains, Inc. has operated as a broker during the above period by facilitating the sale of UST in exchange for compensation primarily in the form of retained interest amounts including by marketing UST, accepting Plaintiff's deposits, providing answers to investor questions about transaction details, accepting payment for orders, and working with the issuer to purchase UST held on behalf of Plaintiffs after payment. All UST are, and at all relevant times were, securities within the meaning of Section 2(a)(1) of the Securities Act. Id. § 77b(a)(1).

173.     A "dealer" includes an entity "engaged in the business of buying and selling securities. . . for such person's own account," insofar as such transactions are part of that person's "regular business." Id. § 78c(a)(5).

174.     Stablegains, Inc. has operated as a dealer during the above period by holding itself out as an investment platform, by having regular customers, by maintaining custody over customers' UST, by providing customers with access to services allowing purchase of UST on credit, by having a regular turnover inventory of securities, by purchasing UST for accounts in Stablegains, Inc.'s own name (often at a discount), and profiting from the interest earned on UST purchased with Plaintiffs' deposits.

175.     Throughout the above period, Stablegains, Inc. has made use of means and instrumentalities of interstate commerce to effect transactions in, and to induce or attempt to induce the purchase or sale of, UST.

176.     Stablegains, Inc. has never registered as a broker or dealer in accordance with section 15(b) of the Exchange Act.

177.      Stablegains, Inc. has thus operated as an unregistered broker-dealer in violation of section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

178.      In the course of operating as an unregistered broker-dealer, Stablegains, Inc. has entered into contracts with Plaintiffs pursuant to which Stablegains, inc. retained a portion of the interest earned on the UST owned by Plaintiffs.

179.      The foregoing contracts were made in violation of Section 15(a)(1) of the Exchange Act. The performance of these contracts necessarily involves the violation of section 15(a)(1) because, pursuant to each such contract, Stablegains, Inc. was required to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer.

180.      Section 29(b) of the Exchange Act provides in relevant part that "[e]very contract made in violation of any provision of this chapter . . . and every contract (including any contract for listing a security on an exchange) . . . the performance of which involves the violations of, or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, . . . shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b). 231. Section 29(b) affords Plaintiffs the right, which they hereby pursue, to void and rescind the contracts pursuant to which they paid Stablegains, Inc. for fulfillment of purchase orders for UST and to recover, as a rescissory remedy, the amounts they have paid under those contracts.

## FIFTH CAUSE OF ACTION

### Offer or Sale of Unqualified Securities
### Cal. Corp. Code §§ 25110, 25130, and 25503

181. Plaintiffs reallege the allegations above.

182. The California Corporate Securities Law of 1968 ("California Securities Act") forbids the offer or sale of unqualified securities. Cal Corp. Code §§ 25110, 25130. Any person who offers or sells a security in violation of section 25110 or 25130 is "liable to any person acquiring from them the security sold in violation of that section, who may sue to recover the consideration they paid for that security with interest thereon at the legal rate, and reasonable attorney's fees, less the amount of any income received therefrom, upon the tender of that security, or for damages, if they no longer own the security, or if the consideration given for the security is not capable of being returned. Damages, if the plaintiff no longer owns the security, shall be equal to the difference between (a) the purchase price plus interest at the legal rate from the date of purchase, plus reasonable attorney's fees, and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received therefrom by the plaintiff." Id. § 25503.

183. A security includes, inter alia, "investment contract[s]" and derivative instruments (such as "call[s]" and "option[s]"). Id. § 25019.

184. UST is, and at all relevant times has been, securities within the meaning of the California Securities Act. Id. § 25019. UST was neither qualified under the California Securities Act nor exempt from qualification. Id. §§ 25110, 25130.

185. Stablegains, Inc. purchased and sold UST to Plaintiffs through its operations in California. Customers of Stablegains, Inc. transact solely with Stablegains, Inc. itself, and Stablegains, Inc. is thus a seller of UST.

186. Moreover, in investing user funds into the Anchor Protocol staking platform, Stablegains, Inc. solicited these purchases, and in doing so was motivated at least in part by a desire to

serve its own financial interests or the financial interests of owners of UST for sale. Stablegains, Inc. received a direct financial benefit, in the form of retained interest sums, from capital invested by its customers. Stablegains, Inc. further benefits from purchases of UST because such purchase support a liquid trading market for UST, which in turn makes Stablegains, Inc. more attractive to investors and issuers.

187. Stablegains, Inc. directed the foregoing actions to California, including without limitation through solicitations directed by Stablegains, Inc. to users in California and received by users in California.

188. Accordingly, Stablegains, Inc. has violated the California Securities Act through its sale of unqualified securities.

189. Plaintiffs funds were used by Stablegains, Inc. to purchase UST without their knowledge or consent. Thereafter, Plaintiffs were forced to sell their UST interests at a loss.

190. Plaintiffs seek damages, inclusive of transaction fees, as to each transaction in which any UST was purchased and was subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

### NINTH CAUSE OF ACTION

### Sale of Securities by an Unregistered Broker-Dealer
### Cal. Corp. Code §§ 2521 and 25501.5(a)

191. Plaintiff realleges the allegations above.

192. The California Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is licensed or exempt from licensing under California law. Cal. Corp. Code § 25210.

193. A "broker-dealer" includes "any person engaged in the business of effecting

transactions in securities in [California] for the account of others or for that person's own

account" and any "person engaged in the regular business of issuing or guaranteeing options with

regard to securities not of that person's own issue." Id. § 25044. A security includes, inter alia,

"investment contract[s]" and derivative instruments (such as "call[s]" and "option[s]"). Id. §

25019.

194. Stablegains, Inc. has operated as a broker-dealer in California during at least the months

from October of 2021 through May of 2022. Stablegains, Inc. has engaged in the business of

effecting transactions in securities for the account of others by facilitating the sale of UST in

exchange for compensation primarily in the form of transaction fees, including by marketing

UST, accepting customers' deposits, providing answers to investor questions about transaction

details, accepting payment for orders, and working with issuers to purchase UST in its own name

for the benefit of its investors. Stablegains, Inc. has engaged in the business of effecting

transactions in securities for their own account by holding itself out as willing to buy UST

on a continuous basis for staking on Anchor Protocol, and as willing to provide liquidity to the

market for digital assets, by having regular customers, by maintaining custody over UST held for

the benefit of its customers', by providing its customers with interest payments on UST

purchased on their behalf, using their deposits, and by having a regular turnover inventory

of securities, by purchasing UST for accounts in their own name (often at a discount), and by

retaining one quarter of all interest payments earned on the UST staked on the Anchor Protocol

platform. All UST are, and at all relevant times have been, securities as defined by California

law. Stablegains, Inc. directed the foregoing actions to California, including without limitation

through solicitations directed by foregoing actions to California, including without limitation

through solicitations directed by Stablegains, Inc. to users in California and received by users in California.

195. Stablegains, Inc. has never registered or applied for registration as a broker-dealer under California law. In addition, Stablegains, Inc. does not qualify for any exemption from registration of broker-dealers under California law.

196. Stablegains, Inc. has thus operated as an unregistered broker-dealer in violation of Cal. Corp. Code § 25210.

197. In the course of operating as an unregistered broker-dealer, Stablegains, Inc. has purchased UST on behalf of Plaintiffs, using funds deposited by Plaintiffs. Stablegains, Inc. solicited the Plaintiffs to make deposits, which were in turn used to purchase UST. In doing so, Stablegains, Inc. was motivated at least in part by a desire to serve its own financial interests. Stablegains, Inc. received a direct financial benefit, in the form of interest payments received from the Anchor Protocol platform, from each dollar of UST purchased by Stablegains, Inc. using depositor funds, and staked on the Anchor Protocol platform. Stablegains, Inc.. further benefit from purchases of UST because such purchases support a liquid trading market for UST, which in turn allows Stablegains, Inc. to generate interest on the sums deposited by its users.

198. Under California law, any person who offers or sells a security in violation of Cal. Corp. Code § 25210 is liable to the purchaser for recission of the sale, or if the purchaser no longer owns the security, for damages. Id. § 25501.5(a)(1). A purchaser who no longer owns the security is entitled to damages in an amount equal to the difference between: (i) the price at which the security was bought plus interest at the legal rate from the date of purchase; and (ii) the value of the security at the time it was disposed of by the purchaser plus the amount of any income received on the security by the purchaser. Id. § 25501.5(a)(4).

199. Accordingly, Stablegains, Inc. has violated Cal. Corp. Code §§ 25210 and 25501.5(a).

200. Plaintiffs deposited funds on Stablegains, Inc. Those funds were subsequently used by Stablegains, Inc. to purchase UST which was later sold following losses of over ninety percent of their investment. Plaintiffs now seek damages, inclusive of transaction fees, as to each transaction in which any UST was purchased, using Plaintiffs' funds, and subsequently sold at a loss, plus applicable costs, attorneys' fees, and interest.

## **PRAYER FOR RELIEF**

181.      WHEREFORE, Plaintiffs pray for judgment against Defendants as to each and every count, including:

- An order declaring that Defendants' actions, as set forth above, constitute violations of the federal and state laws set forth above and that Defendants are liable to Plaintiffs as described herein, for damages arising therefrom.

- An injunction enjoining Stablegains, Inc. from offering UST for purchase or sale without having registered Stablegains, Inc. as a national securities exchange or broker-dealer as required by federal and state securities laws.

- An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Stablegains, Inc. from continuing the unlawful practices alleged herein, and injunctive relief to remedy Stablegains, Inc.'s past conduct.

- A judgment awarding Plaintiffs all appropriate damages, in an amount to be determined at trial.

- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement.

- A judgment awarding Plaintiff pre-judgment and post-judgment interest to the maximum extent permitted by law;

- A judgment awarding Plaintiffs costs and fees, including attorneys' fees to the maximum extent permitted by; and

- Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

182.     Plaintiffs demand a trial by jury for all issues so triable.

Dated: February 18, 2023

Respectfully Submitted,

Alec N. Ohanian (SBN: 334015)
679 Robin Glen Drive
Glendale, CA 91202
Tel: 818.324.1010
Email: alecnohanian@gmail.com